## JONAS F. BROWN *vs.* ELI B. AMES.

Argued Nov. 26, 1894. Affirmed Dec. 21, 1894.

No. 9185.

**Evidence held insufficient to show authority to sign another's name to note.**

Action to recover the amount of a promissory note sold by defendant to plaintiff on the ground that one of the signatures on the paper was forged. The defenses were: First, that the signature was not forged; second, that in selling the note the defendant acted merely as agent of a disclosed principal. *Held,* that there was no evidence that the person whose name was alleged to have been forged ever gave any authority, either apparent or actual, to any other person to sign his name on the note.

**Implied guaranty on the sale of commercial paper.**

Where a person sells commercial paper he impliedly guarantees that the signatures are genuine.

**An agent to sell must disclose his principal to the purchaser or he will be himself liable.**

If he is selling it as agent, he must, in order to relieve himself from personal liability, disclose not only the fact of his agency, but also the name of his principal; and the person named as principal must be such in fact,— that is, one for whom he is authorized to act.

**Evidence insufficient to prove agency.**

*Held,* that in this case there was no evidence that defendant was in fact the agent of the alleged principal.

Appeal by defendant, Eli B. Ames, from an order of the District Court of Hennepin County, *Henry G. Hicks,* J., made March 8, 1894, denying his motion for a new trial.

One George A. Morse of Minneapolis on September 15, 1892, made his negotiable promissory note for $8,000 payable to his own order six months thereafter. He indorsed it and also wrote the name of his father, Elisha Morse, underneath his own on the back of the note and sent it to W. A. Newton, a note broker, to be sold. He offered it to defendant for $7,674. Defendant, without agreeing to purchase it, took the note for examination and inquiry. He went with it to plaintiff, Jonas F. Brown, and sold it to him for $7,700 and received the money. He then paid the broker Newton

$7,674 and made a profit of $26. When the note fell due George A. Morse was insolvent and his father had removed to San Francisco, Cal. The note was not paid and was protested for nonpayment and notice given to Elisha Morse. He promptly denied the genuineness of the signature purporting to be his. He had discovered a previous forgery also, but concealed it. Plaintiff then brought this action against Ames on his implied guaranty of the genuineness of the names. Defendant answered that the signature of Elisha Morse was genuine and alleged that in the sale he was merely agent for Newton and so disclosed to plaintiff. On the trial, January 23, 1894, after the evidence was all given defendant requested the Judge to charge the jury as follows:

"8th. Where a person knows that his signature to negotiable paper has been forged by another and conceals the fact that such forgery has been committed, and thereupon goes to, and resides in a distant state, remaining in correspondence with the forger, and makes no change in his outward relations toward him, these facts may be taken into consideration upon the question whether or not such person's indorsement of negotiable paper made by the known forger within one month subsequent to the discovery of the first forgery, was made by the authority or with the consent of the person whose name is so indorsed."

The request was refused and defendant excepted. The jury found for plaintiff and assessed his damages at $8,433. Defendant moved for a new trial. Being denied he appeals.

*Kitchel, Cohen & Shaw,* for appellant.

The general current of authority, both in England and in the United States, appears to sustain the position that one who transfers negotiable paper, either without indorsement, or indorsed "without recourse" warrants its genuineness to such an extent that he is bound to make it good if it is found bad and is returned within a proper time. The question has never been directly before this court, and we therefore call attention to cases which show a modification of this proposition. The most notable case is one in Maine which relieves the transferer from liability upon the implied warranty, if he sold the paper as property and not in payment of a debt, no scienter being shown. *Baxter* v. *Duren,* 29 Me. 434.

This case followed *Ellis* v. *Wild*, 6 Mass. 321. But *Ellis* v. *Wild* was overruled in *Merriam* v. *Wolcott*, 3 Allen, 258. *Baxter* v. *Duren* is said by the text books to have been overruled in *Hussey* v. *Sibley*, 66 Me. 192, but the statement of the text writers is expressly repudiated by the Supreme Court of Maine in *Mulliken* v. *Chapman*, 75 Me. 306, and it is there stated that *Baxter* v. *Duren* is still the law of Maine. The Maine case was followed several years later by the Maryland Court of Appeals. *Fisher* v. *Rieman*, 12 Md. 497. The lower court, upon a review of the authorities, decided that the rule laid down in *Baxter* v. *Duren* was incorrect. This ruling was reversed by the Court of Appeals and *Baxter* v. *Duren* was followed.

The distinction made in Maine and Maryland is between the transfer of a note for cash and a transfer in payment of a debt then due or created at the time. This distinction is criticized by some courts as being somewhat shadowy. But the popular notion that one who does not put his name upon the back of negotiable paper in transferring it, repudiates all liability with reference to the paper, is well founded in reason. The purchaser and seller being both equally ignorant of a defect in the paper, there is no good reason why the burden of the defect should rest absolutely upon the seller and never upon the purchaser.

What disclosure must an agent make in order to relieve himself from liability as a principal? The law of disclosure where an agent seeks to relieve himself from liability upon an implied warranty of genuineness of a promissory note sold by him, has nowhere been better stated than in *Worthington* v. *Cowles*, 112 Mass. 30. The question is, from whom did the plaintiff understand that he was buying the note, from the broker, Newton, or from defendant. If such a state of facts occurred that the plaintiff understood or ought to have understood as a man of reasonable intelligence that he was dealing with Newton, the defendant would not be liable. *Morrison* v. *Currie*, 4 Duer, 79; *Millikin* v. *Jones*, 77 Ill. 372.

The charge of the court frittered away the defendant's case and unduly emphasized the plaintiff's contentions. Instructions to the jury should not be so framed as to single out isolated portions of the evidence not in themselves decisive, and make the verdict turn upon

them.    Singling out isolated facts, not in themselves decisive of the merits of the controversy, and instructing the jury that if they believe such facts they will find for plaintiff, is misdirection and an invasion of the province of the jury.    It is a frequent and pernicious error for which judgments are not sufficiently often reversed.    Thompson, Trials, § 2328.

On August 18, 1892, Elisha Morse learned that his son George had forged a note for $3,000 and insisted that his son should return the money received upon the forged paper.    The note, however, remained in circulation.    Prior to that time George had acted generally for him in his business and had his office in the building owned by Elisha and his brother.    Elisha usually remained away from Minneapolis from early in October until the spring.    During the summer when this forgery was discovered Elisha occupied a suite of rooms together with his son and the name of the former partnership, Elisha Morse & Son, still appeared at the bottom of the stairs at the front of the building. Before the discovery of the first forgery, Elisha Morse had settled other irregularities in the conduct of his son by repaying certain sums which had been embezzled by his son.    He had also made good certain sums which his son had obtained by using the signature of Elisha Morse & Son upon paper for his own benefit solely and not for the benefit of Elisha Morse & Son.    There were two transactions of the latter nature, both of which came to Elisha's knowledge prior to August 18, 1892.    With this knowledge and within two days after the discovery of the forgery, Elisha left Minneapolis and remained away until the following May.    He changed his outward relations to his son in no manner whatever; he gave no warning to the public against his son George; he remained in correspondence with him until the middle of November, 1892.    The note in suit was negotiated in September, 1892.    The whole amount of the forgeries that the father claimed were committed by his son was over $61,000.    On this state of facts and as bearing upon the question of Elisha Morse's denial of his signature on the back of the note in suit, defendant requested the Judge to give his eighth request.    The refusal was error.    *Barbour* v. *Gingell*, 3 Esp. 60; *Bronson's Ex'r* v. *Chappell*, 12 Wall. 681.

The case made for the plaintiff by the complaint and the proof was a case of express warranty which precluded any recovery upon an implied warranty.    *Jackson* v. *Langston*, 61 Ga. 392; *Baldwin* v. *Van*

*Deusen,* 37 N. Y. 487; *Denning* v. *Foster,* 42 N. H. 175; *Douglass* v. *Moses,* 89 Ia. 40; *Bucy* v. *Pitts Agricultural Works,* 89 Ia. 464.

The jury should have been charged that at the time Brown purchased the note in suit he knew that Ames was acting merely as a broker in negotiating its sale.

*George R. Robinson,* for respondent.

By the sale of the note to Brown defendant was presumed to be the owner. He had the possession of the note and sold it to Brown without disclosing any principal for whom he claimed to make the sale, and therefore he is personally liable. Story, Agency, § 266; Paley, Agency, §§ 371, 372.

The duty is upon the agent to disclose his agency, if he would avoid responsibility. The duty is not on others to discover it. *Baldwin* v. *Leonard,* 39 Vt. 260; *Brockway* v. *Allen,* 17 Wend. 40; *Taintor* v. *Prendergast,* 3 Hill, 72; *Winsor* v. *Griggs,* 5 Cush. 210; *Thompson* v. *Davenport,* 9 B. & C. 78; *Mills* v. *Hunt,* 20 Wend. 431.

By selling the note to plaintiff the defendant impliedly warranted the paper to be what it purported to be and genuine. *Thrall* v. *Newell,* 19 Vt. 202; *Lobdell* v. *Baker,* 1 Met. 193; *Terry* v. *Bissell,* 26 Conn. 23; *Cabot Bank* v. *Morton,* 4 Gray, 156; *Markle* v. *Hatfield,* 2 Johns. 455; *Herrick* v. *Whitney,* 15 Johns. 240; *Canal Bank* v. *Bank of Albany,* 1 Hill, 287; *Ledwich* v. *McKim,* 53 N. Y. 307; *Talbot* v. *Bank of Rochester,* 1 Hill, 295; *Aldrich* v. *Jackson,* 5 R. I. 218; *Whitney* v. *National Bank of Potsdam,* 45 N. Y. 303; *Merriam* v. *Walcott,* 3 Allen, 258.

The fatal objection to defendant's claim of error in refusing his eighth request is, that no evidence was introduced tending to prove the facts stated therein. The only instance brought home to his knowledge Elisha Morse at once repudiated, and further it did not appear that any of the parties to this transaction knew of or were influenced in this transaction by any knowledge that any such pretended implied authority existed, and each case cited by counsel is where parties have been misled by a knowledge of prior acts ratified by the parties denying the signature.

MITCHELL, J. This action was brought to recover the amount of a note sold by defendant to plaintiff, which purported to have been

executed by George A. Morse, payable to his own order, and indorsed by himself and his father, Elisha Morse. The ground on which a recovery was claimed was that the indorsement of Elisha Morse was forged. The defendant interposed two defenses: First, a denial that the indorsement was forged; and, second, that in selling the note he merely acted as agent for a disclosed principal, one Newton.

1. To maintain the first defense, evidence was introduced tending to prove that the indorsement was made by Elisha Morse in person, in his own handwriting. No complaint is made that this evidence was not fairly submitted to the jury. Evidence was also introduced which, it is claimed, tended to prove that the indorsement was made by George A. Morse by authority, actual or apparent, from his father. We do not think this evidence made a case for the jury. This was certainly so upon the question of apparent, as distinguished from actual, authority, for the reason that it does not appear that any of the parties who dealt with this note knew of any of the acts of Elisha which are claimed to have clothed his son with such authority; and consequently these acts could not have influenced their conduct.

Of course, it is familiar law that the responsibility of a person for acts done in his name by another, merely on the ground that the former had clothed the latter with apparent authority to do the act, rests upon the doctrine of equitable estoppel. Neither do we think that there was any evidence that would have justified the jury in finding that George had actual or real authority to sign his father's name. The father testified positively and unqualifiedly that he never authorized any one to write his name on the note, and never in any manner consented to its being done. The only evidence, if any, tending in the slightest degree to contradict or impair the force of his testimony is to be found in the circumstances attempted to be recited in defendant's eighth request to charge. If there had been other evidence of the son's authority, some of these circumstances might have been corroborative; but, standing alone, they are wholly insufficient to establish the fact. Stated in the strongest light, all these circumstances amounted to was that the father, when he discovered that his son had forged his name to a previous note, instead of publishing his crime to the

public, and warning them against him, and breaking off all intercourse with him, concealed the crime, made his son refund the money he had obtained on the forged paper, and continued to correspond with him thereafter. It can hardly be necessary to say that such acts, dictated by paternal feelings, would not prove authority to the son to sign his father's name to other paper. It is therefore unnecessary to consider any of the assignments of error relating to the manner in which the court submitted to the jury the issues involved in the first defense.

2. Notwithstanding that a few cases, notably in Maine and Maryland, upon a "somewhat shadowy distinction," make certain exceptions to the rule, yet the doctrine is too well established to admit of discussion that where one sells or transfers commercial paper, although not a party to the instrument, or he indorses it "without recourse," the vendor impliedly guarantees that the signatures to the paper are genuine, and not forged, unless it is expressly understood at the time of the sale that he refuses to guaranty its genuineness. See Benj. Sales (6th Ed.) 638, and cases cited.

The fact that the plaintiff pleads as being express the same warranty which the law implies will not prevent a recovery although he fails to prove an express warranty.

If a person is selling the paper as agent for another, he can relieve himself from personal liability only by disclosing to the purchaser the fact of his agency and the name of his principal. It is not enough merely to give notice of the fact that he is acting as agent; he must also disclose who his principal is. The reason of the rule is that the purchaser may determine the responsibility of the principal to answer for any failure of title to or genuineness of the paper. Moreover, the person named as principal must be a principal in fact, a person for whom the agent is authorized to act, and who will be legally bound by his act. These propositions are so elementary that the citation of authorities in their support is unnecessary.

If there was any evidence that the defendant was the authorized agent of Newton to sell this note, we are inclined to think that the charge of the court would be subject to some of the criticisms of counsel.

It is not necessary that an agent, to relieve himself of personal liability, should say, in so many words, "I am acting merely as agent for

A., who is my principal." If such a state of facts occurred that the plaintiff understood, or ought, as a man of reasonable intelligence, to have understood, that he was buying the paper from Newton, and not from defendant, this would have amounted to a sufficient disclosure of defendant's agency and of the name of his principal. *Worthington* v. *Cowles*, 112 Mass. 30. But we have examined and re-examined the record in this case with great care, and have been unable to find any evidence that defendant ever was the agent of Newton for any purpose. Hence, even if defendant had expressly stated to plaintiff in so many words that he was acting merely as agent, and that Newton was his principal, we cannot see that it would have availed him.

The prior history of this note is left in some obscurity. The evidence tends to indicate that Newton was not the owner, but merely held it as broker, to sell for some one else. But this is perhaps immaterial. It appears from the evidence that the only negotiations between Newton and defendant were with reference to defendant himself becoming the purchaser of the paper, and that it was intrusted to his possession solely with reference to and for the purposes of such contemplated purchase. Newton had told defendant he was expecting to receive such a note, and that the discount would be so much, and asked him if he did not want it. When the note arrived, Newton gave it to defendant, for the sole purpose, so far as appears, of inspection and examination, to enable him to determine whether he would take it. Defendant, not having the funds to take it himself, applied to plaintiff to do so, naming the amount for which he could have it at a sum slightly in excess of the amount for which Newton offered it to him. Plaintiff paid for it in a check payable to defendant, which the latter deposited to his own credit, and then by his own check paid Newton the amount for which the latter had offered the note. Not a word, so far as appears, ever passed between Newton and defendant in regard to the latter selling the note as agent of the former. Plaintiff's name was never once mentioned as the purchaser of the note. On the contrary, the transaction between defendant and Newton was conducted and closed up entirely upon the basis of defendant himself being the purchaser of the paper. The only time that the name of plaintiff or any third party was ever mentioned between Newton and defendant in connection with the purchase of the note was, according to defendant's testimony, when in one of the interviews between them

before the arrival of the note defendant "told him [Newton] that he had a conversation with Mr. Brown about taking it." The insufficiency of any such casual remark to create the relation of principal and agent between defendant and Newton is too apparent to require discussion. In short, it seems to us that, as to the principles of law applicable, the case stands precisely as if defendant had himself bought the paper of Newton, and subsequently sold it to the plaintiff.

As we view the evidence, really the only issue for the jury was whether the indorsement of Elisha Morse was genuine or forged. The loss to defendant is large compared with the small profit which he made out of the transaction, but this is the result of his own acts. As between him and the plaintiff, both of whom doubtless acted in the utmost good faith, the loss must, on the clearest principles of law, fall on the defendant.

Order affirmed.

(Opinion published 61 N. W. 448.)